E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALIX MCKENNA (Cal. Bar No. 295202)
Assistant United States Attorney
KYLE W. KAHAN (Cal. Bar No. 298848)
Special Assistant United States Attorney
General Crimes Section
    1100/1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6166/2238
    Facsimile: (213) 894-0141
    E-mail:  alix.mckenna@usdoj.gov
           kyle.kahan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>NECHELLE DENISE KING,<br>  aka "Nechelle Dairy,"<br><br>      Defendant. | No. CR 22-00008-MCS<br><br>GOVERNMENT'S SENTENCING POSITION<br><br>Hearing Date: October 17, 2022<br>Hearing Time: 3:00 p.m.<br>Location:    Courtroom of the<br>               Hon. Mark C. Scarsi |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, Assistant United States Attorney Alix McKenna, and Special Assistant United States Attorney Kyle W. Kahan, hereby files its sentencing position.

//

//

//

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, exhibits, and such further evidence and argument as the Court may permit.

Dated: October 6, 2022         Respectfully submitted,

                                              E. MARTIN ESTRADA
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

                                      /s/ *Alix McKenna*
ALIX MCKENNA
Assistant United States Attorney

KYLE W. KAHAN
Special Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

While working as a window clerk at a United States Postal Service ("USPS") post office in Bellflower California, defendant Nechelle Denise King ("defendant") stole thousands of dollars from the United States government by cashing money orders that she did not pay for. (Presentence Investigation Report ("PSR") ¶¶ 1-33, Dkt. 77.) On May 24, 2022, defendant was convicted at trial of three counts of Wire Fraud, in violation of 18 U.S.C. § 1343, and three counts of Theft of Government Property in Excess of $1,000, in violation of 18 U.S.C. § 641. (PSR ¶ 1.) The six counts for which defendant was convicted relate to a $1,000 money order cashed on February 23, 2017, and two $1,000 money orders cashed on March 2, 2017, for a total loss of $3,000. (PSR ¶¶ 20-29). However, internal data from the post office shows that between March 1, 2016, and March 16, 2017, defendant embezzled approximately $111,016.99 through her fraudulent money order scheme. (PSR ¶¶ 31; Exhibit A, Eamon Boyd Transaction and Tender Spreadsheet[1]).

The United States Probation and Pretrial Services Office ("USPO") calculated a total offense level of 19 and a criminal history category of I, for a United States Sentencing Guidelines ("Guidelines") range of 30 to 37 months' imprisonment. (Presentence

---

[1] Exhibit A contains two spreadsheets created by the government's expert witness, Eamon Boyd. The first spreadsheet tracks money order replacement transactions and tenders at the Bellflower Post Office from March 1, 2016, to March 16, 2017. As explained by Mr. Boyd at trial, each transaction can be organized by the unique Basket ID number. Nearly every replacement transaction during this time period was performed by defendant. The second spreadsheet is a summary of the total number of replacement transactions by USPS window clerks during that time period categorized by the value of the replacement money order.

Investigation Report ("PSR") ¶¶ 57, 69, 103.) The government agrees with the USPO's calculation and recommends a sentence at the low end of this range: 30 months imprisonment. USPO calculated the amount of restitution owed as $111,016.99 to be paid to USPS. (Id. ¶ 116.) Defendant is also subject to a fine of up to $250,000. (Id. ¶ 112.) USPO found that the court can impose a supervised release term of up to three years. (Id. ¶ 106-107.) USPO has not identified any factors that would warrant a variance from the applicable sentencing guideline range. (Id. ¶ 121.) As such, the government further recommends a three-year period of supervised release, a mandatory special assessment of $600, and restitution totaling $111,016.99.

## II. STATEMENT OF FACTS

From March 2, 2015, until May 15, 2017, defendant worked as a retail clerk at the USPS post office in Bellflower. (Id. ¶ 8.) Part of her job involved processing in-person money order transactions. (Id.).

### A. Postal Money Order Issuance

A customer seeking a money order is first required to pay for the instrument with cash or a debit transaction. (Id. ¶ 9). The retail clerk then places a blank money order in a special printer and prints a money order in the requested amount. (Id.) Clerks cannot issue money orders to themselves. (Id.) When a retail clerk issues a money order, she enters the amount of money in a digital system called the Retail Systems Software ("RSS"), which creates a record of the sale. (Id. ¶ 10.) The RSS then credits the retail clerk's cash drawer in the amount of the money order plus a service charge and sends a record of the transaction via wire to postal audit software in Eagan, Minnesota. (Id. ¶¶ 11-12.)

2

### B. Replacement Money Order Issuance

In limited circumstances, such as when a money order is physically damaged, a retail clerk can issue a replacement money order without charging the customer a replacement fee. (Id. ¶ 13.) When issuing a replacement money order, the clerk fills out an electronic form called a PS Form 6401 with the payee's name and address and has the customer sign the form. (Id.)  A customer receiving a replacement order is not required to make a payment because the customer already purchased the original order. (Id.) Accordingly, when a replacement order is issued, the RSS software does not expect payment and USPS records do not reflect that a payment is owed. (Id. ¶ 13).

By contrast, if a money order prints incorrectly, a clerk can simply void the order by stamping it as "spoiled." (Id. ¶ 14.)  When a money order is voided, the clerk is supposed to take a payment from the customer, and the RSS system expects that a payment is due. (Id.)

### C. Defendant's Scheme

Between approximately March 1, 2016, and March 17, 2017, defendant employed a scheme to defraud USPS by issuing, replacing, and then voiding money orders. (Id. ¶ 15.)  In this way, defendant was left with a cashable replacement money order, but because the original instrument was voided, the RSS system mistakenly believed that no money was due. (Id. ¶ 15.)  Defendant then cashed the replacement money order. (Id.)

### D. Charged Incidents

Defendant's convictions in this case stem from three occasions in which she was caught on camera issuing, voiding, and replacing

3

money orders that she never paid for. (PSR ¶ 19.) On February 22, 2017, defendant issued herself a $1,000 money order, which she then replaced and voided. (Id. ¶¶ 19-24.) Defendant cashed it the following day, even though she never paid for it. (Id. ¶ 24.) On March 1, 2017, defendant issued, voided, and replaced two additional $1,000 money orders. (Id. ¶¶ 25-28.) She cashed the orders the following day, even though she never paid for them. (Id. ¶ 29.)

### E. Additional Thefts

While defendant was only tried and convicted for three incidents of theft, postal data shows that between approximately March 1, 2016, and March 16, 2017, she issued approximately 138 replacement or voided money order transactions for approximately $111,016.99. (Id. ¶ 31; Exhibit A.) Normally, the issuance of replacement money orders is rare. During that time period, only one other clerk, a supervisor, issued any replacement orders – four replacements with a total value of $1,436. (PSR ¶ 30.) Notably, when defendant would issue, replace, and void a money order purchased by a customer, or a variation of that scheme, the cash paid by the customer should have been inside the cash register. At no point did defendant report this extra cash. Indeed, the failsafe audits within the RSS designed to track excess cash were thwarted by defendant's conduct. By issuing, replacing, and voiding, defendant was able to bypass these internal audits and make off with the phantom cash.

## III. GUIDELINES CALCULATIONS

### A. Offense Level

USPO found that defendant's total offense level was 19. (PSR ¶¶ 63.) The government agrees with this calculation. USPO correctly determined that the six counts of conviction group together

under U.S.S.G. § 3D1.2(d) because the offense level is determined largely on the basis of total loss. (PSR ¶ 39.) Because the statutory maximum offense for each of defendant's crimes is twenty years, the base offense level is 7. (Id. ¶ 41.) However, as USPO correctly noted, the total amount of loss when considering King's uncharged but related conduct is more than $95,000 but less than $150,000. (Id. ¶ 43.) Thus, there is an eight-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(E). (Id. ¶ 43.)

USPO correctly added a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of public trust. (Id. ¶ 55.) This enhancement applies if a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Such a position is defined by an employee's professional or managerial discretion and low-level of supervision. U.S.S.G. § 3B1.3, n.1. As a retail clerk for the post office, defendant was responsible for issuing monetary instruments to the public on behalf of USPS. Defendant exploited her government job to steal thousands of dollars. Defendant's position allowed her access to the RSS and its various functions, including the ability to issue, replace, and void money orders. Through this, defendant was able to conceal her conduct and prevent her immediate supervisors from detecting the lack of excess cash at her station. Accordingly, the enhancement applies. Additionally, defendant further utilized her position to conceal her fraudulent conduct for an extended period of time by replacing and voiding money orders for over a year. See United States v. Christiansen, 958 F.2d 285, 288 (9th Cir. 1992) (finding a credit union manager who used her position

to embezzle funds and conceal her theft for an extended period of time abused a position of trust).

USPO also correctly added a two-level increase for the use of device making equipment under U.S.S.G. § 2B1.1(b)(11)(A). (Id. ¶ 49.) Device making equipment is defined as "any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device." 18 U.S.C. § 1029 (e)(6). The term "access device" is defined in 18 U.S.C. § 1029 (e)(1) and includes any "means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." 18 U.S.C. § 1029 (e)(1). While transfers originated solely by paper instruments are excluded from this definition, money orders are distinct. Money orders, unlike checks, are not mere paper instruments. To be properly used, a money order needs to be purchased, issued, and printed by the USPS. In doing this, the details of the money order are electronically stored for tracking and future audits. Unlike checks, money orders go through multiple digital checkpoints to be properly issued and cashed. Accordingly, money orders are access devices under 18 U.S.C. § 1029(e).

In executing her scheme, defendant used a special money order printer that printed the date, the specific post office identifying unit number, the amount of money, and other information on blank money orders. The addition of this information to a blank money order is needed in order to "obtain money" and "initiate a transfer of funds" when a money order is cashed. (Id. 49.) Thus, the money

6

1 order printer constitutes device-making equipment within the meaning
2 of U.S.S.G. § 2B1.1(b)(11)(A).

3     U.S.S.G. § 2B1.1(b)(11)(A)(ii) also includes a two-level
4 enhancement if the defendant possessed any "authentication feature."
5 18 U.S.C. § 1028(d)(1) defines "authentication feature" as including
6 a "certification, symbol, code, image, sequence of numbers or
7 letters, or other feature that either individually or in combination
8 with another feature is used by the issuing authority on an
9 identification document . . . or means of identification to determine
10 if the document is counterfeit, altered, or otherwise falsified."
11 Here, each money order, including King's fraudulent replacement
12 orders, had a unique serial number and a USPS stamp.  (PSR ¶ 49; see
13 also Exhibit B, Money Order 24287158170.)  The unique serial number
14 is used by the post office to keep track of money orders issued, and
15 to make sure that no duplicates or fraudulent orders are issued.  The
16 stamp is printed onto the money order to validate the money order as
17 an authenticate and legitimate money order.  Thus, the serial number
18 constitutes an "authentication feature" and the U.S.S.G.
19 § 2B1.1(b)(11)(A)(ii) enhancement should be applied.

20     While U.S.S.G. § 2B1.1(b)(11)(A)(i) and (ii) both apply to the
21 facts of this case, they are two different ways of meeting the same
22 two-level enhancement and should not both be applied.  See U.S.S.G.
23 § 2B1.1(b)(11)(A).  For this reason, the application of an
24 enhancement for the possession of an authentication feature does not
25 affect the total offense level of 19.  (PSR ¶ 49.)

26     **B.   Defendant's Guidelines Range is 30 to 37 Months**

27     As discussed above, defendant's base offense level is 19 and her
28 criminal history category is I, for a Guidelines range of 30 to 37

months' imprisonment.  (PSR ¶¶ 57, 69.)  The government agrees with this calculation.

**IV. ARGUMENT**

    **A. A Custodial Sentence of 30 Months is Sufficient but Not Greater than Necessary to Achieve the Purposes Set Forth in 18 U.S.C. § 3553(a)**

The Court must impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).  The Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  In addition, the Court should fashion a sentence that reflects the seriousness of the offense, promotes respect for the rule of law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from future crimes of the defendant, among other considerations.  18 U.S.C. § 3553(a)(2).  When considering the § 3553(a) factors, a sentence of 30 months' imprisonment; a three-year term of supervised release; $111,016.99 in restitution to be paid to USPS; and a special assessment of $600 is just, sufficient, and necessary.

Defendant's conduct is very serious.  Defendant occupied a position of public trust when she devised a sophisticated scheme to steal thousands of dollars from USPS.  The theft was not the product of one bad decision.  The charged incidents occurred about a week apart.  Further, the uncharged incidents took place over several months.  Defendant had ample time to reflect on her actions and stop stealing from the government.  Instead, she exploited a software flaw dozens of times and stole more than $100,000.

Nevertheless, there are mitigating factors here. Prior to her conviction in this case, defendant had no criminal record. After high school, defendant joined the army and spent several years as a reservist. (PSR ¶ 79.) She is also the care provider for her six-year-old son. (PSR ¶ 79.)

Ultimately, a low-end sentence of 30 months imprisonment is sufficient, but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

**B.  A Three-Year Term of Supervised Release is Appropriate**

Given the seriousness and sophistication of the instant offense, the imposition of a three-year term of supervised release would provide a needed additional incentive for defendant to refrain from committing further crimes. A three-year term of supervised release, with the terms and conditions recommended by the USPO, is sufficient, but not greater than necessary, to protect the public and deter future criminal conduct.

**C.  Restitution**

Defendant should be ordered to pay back the entire $111,016.99 that she stole from USPS. (PSR ¶ 31). As outlined in Exhibit A, defendant's transaction and tender data demonstrate a pattern of concealing theft through issuing, replacing, and voiding money orders; both through the charged and uncharged conduct. Defendant's charged and uncharged thefts were part of a single scheme to defraud the United States government by cashing money orders without first providing payment. The Ninth Circuit has held that when a defendant is convicted of a crime that requires proof of a "scheme, conspiracy, or pattern of criminal activity," restitution "is not limited to harm caused by the particular counts of conviction," as it would be

9

"absent the scheme element." <u>In re Her Majesty the Queen in Right of Canada</u>, 785 F.3d 1273, 1276 (9th Cir. 2015). Defendant was convicted of three counts of wire fraud, which involved the use or intended use of a "scheme or artifice to defraud." 18 U.S.C. § 1343. Thus, "a restitution order may be based on related but uncharged conduct that is part of a fraud scheme." <u>In re Her Majesty the Queen in Right of Canada</u>, 785 F.3d at 1276.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to: (1) 30 months' imprisonment; (2) a three-year period of supervised release; (3) restitution of $111,016.99; and (4) a mandatory special assessment of $600.